I think at this time, your opposing counsel is not here on the, excuse me, on the National Freight Industries case. Correct, Your Honor. You will have an opportunity, if you would like, to address the Court. I would, because I think this case is a little unique, and if I could grab my materials. Certainly. Certainly. Thank you, Counsel. May it please the Court again, Robert Makarowski on behalf of National Freight. And it's our appeal from a decision that found causal connection between the injury in question and our appeal as to their recommendation for prospective care. And, you know, usually this is not the type of case that you appeal. It deals with manifest weight of evidence. I've been doing this for a long time, and I've had cases where I appealed, where I argued it's against the manifest weight of the evidence, and the judges have come down on me a couple times about, you know, it's up to the Commission to decide these type of issues. But I've never had a case similar to this in terms of fact and what the Commission is recommending in terms of prospective care. And if you could tolerate me for a little bit, I would appreciate it. But this is an individual who worked for National Freight and slipped and fell out of his cap. He landed on his buttocks, and he said he jerked his neck. He was treated at an emergency room and hospital in Detroit, Michigan. X-rays of the cervical spine were normal. There was no diagnosis to the cervical spine. He had an MRI done about a month later. He returned to his regular job, full duty, no restriction as a truck driver. He then went through a series of physicians in terms of care. He was seen by Dr. Pajari, and at that point in time he had no radiating symptoms into his arms. He had a normal neurological examination. The doctor looked at the MRI, said there were disc protrusions, felt that he could continue to work full duty, no restrictions, no recommendation for surgery. Sent him to a pain management person, Dr. Jay, or John, and again the person was working full duty, no restrictions. The doctor looked at the MRI, said disc protrusions, gave him an injection, ordered physical therapy. His treatment stopped in March of 2008, about six months after the occurrence. He then was referred to a neurosurgeon, Dr. Salati. Dr. Salati noted he was working full duty, no restrictions, did a thorough neurological examination, absolutely no findings, MRI showed disc bulge. He then testified that he was seeking out a physician to do surgery. He identified Dr. Bernstein, records show that that was a referral from his counsel. Dr. Bernstein did a complete examination, and Dr. Bernstein noted he was doing full duty, no restrictions, totally normal neurological examination, no findings, no objective findings whatsoever. He reviewed the MRI, he felt that the MRI showed arthritic degenerative changes, disc pathology, no distinct herniation. The person then went without any care, working full duty, no restrictions, no medication, without any additional evaluations for the period of time May 20, 2008 until October 15, 2009. On October 15, 2009, he returned to Dr. Bernstein. Again, normal neurological examination, working full duty, no restrictions. Dr. Bernstein suggested a discography. A discography was done, he returned to Dr. Bernstein. Dr. Bernstein noted he was working full duty, neurological exam normal, no objective findings whatsoever. His recommendation was a fusion. We sent the person to Dr. Levin for purposes of IMEs. He saw Dr. Levin on three occasions, June 23, November 21, 2009, October 15, 2009. April 21, 2008, December 22nd, I'm sorry, June 23, 2008. And Dr. Levin looked at the two MRIs that were done, November 21 and April 21, degenerative changes. He saw him again on December 22nd, working 14-hour days, saw him again. Mr. McGrosky, maybe I'm reading a different medical history than you are. See if you can follow me on this. Okay. This event takes place on October the 23rd of 2007. Correct, Your Honor. He has an MRI on November the 21st of 2007 that reveals a disc herniation at C6, C7, narrowing of the right aspect of the central canal, and a small disc herniation at C5, C6. Is that correct? That's what the MRI says, right. Okay. Hold on. Hold on, hold on, hold on. Now, we go forward and Shalahi, is that his name? Shalahi. Shalahi. He notes that the claimant's neck pain can be due to multilevel cervical foramus stenosis and the right C6, C7 disc bulge herniation. Right. And he wrote that the reported accident exacerbated such a diffused spondiotic disease with the cervical spine to the point that it's now symptomatic and possibly caused the C6, C7 herniated disc. Then we get another MRI on April the 21st, 2008. Is that right? That's correct. That notes disc bulging at C5, C6. Right, disc bulging, right. Right. Then on May 1st, there's an EMG. The EMG reveals moderately severe right-sided C4 to C6 radiculopathy and ongoing denervation of the paraspinal muscles on that side worse at C6 level. Then Bernstein in May of 2008 recommends that he have a discogram. Correct, Your Honor. You send him to Levin in June of 2008. Correct, June 23rd. December of 2008. Correct. May of 2008. Correct. And August of 2008. Correct, Your Honor. Okay. Bernstein, or pardon me, Abu Sharif performs the discogram on November the 12th, 2009. Correct. And it shows positive concordant findings associated with annular tears at C5, 6, and at C6, 7. The recommendation is a two-level anterior cervical decompression infusion surgery. And Bernstein then testifies, consistent with his report, that he did not believe that the complainant had any nonsurgical options left to alleviate his pain, and he was of the opinion that the workplace accident caused the injury to his cervical spine. Now, what's the problem? Okay. I think you missed a few things. What did I miss? When you saw Dr. Bernstein on May 19, 2008, Dr. Bernstein looked at the MRIs, said that the interpretation by the radiologist was generous and that the person actually had disc bulges, no frank herniation. Dr. Bernstein also did an examination of this person in terms of the EMG that Your Honor pointed out, and Dr. Bernstein's findings were that there were no numbness, weakness, or tingling in the arm. So he, in a sense, ruled out objectively that there was any ongoing radiopathy in the person's cervical spine down into his arms. If you look at diagnostic tests, and I think you've heard these arguments before, just because a certain thing is identified doesn't mean that that is something which is symptomatic. Dr. Bernstein did a complete neurological examination on this person, just like Dr. Salati did, and they were normal. Dr. Salati never recommended, in this case, surgery. He recommended physical therapy after reviewing the MRI. Dr. Bajari never recommended surgery. Dr. Jane never recommended surgery. And in terms of the findings, when you look at all this, and what's important is Dr. Levin said the findings on the MRI predated. Dr. Bernstein agreed with that. He said the findings on the MRI predated. We took Dr. Bernstein's deposition on page 24, and this is important. He testified as to normal sensation, you know, his exam being totally normal. And the question to him was, from an objective standpoint, do you have any positive objective findings when you examine Mr. Brooks to support the proposition that he had any pathology whatsoever at the C5, C6, or C6, C7 disc level? His answer was no. Well, yeah, but you've got it right here. You've got two bad reports off your IME, the first two. Oh, there's no question. He hung out to dry. There's no question that there's some bad IME reports. All based on the fact that the guy was asymptomatic before this event and totally symptomatic after. But the problem with it is, when you talk about symptomatic or talk about pain, everyone agrees in this case that there's no objective findings of any damage to the C5, C6, C6, C7. When you talk about pain, this person, since December of 2008 to present, continues to work his full job duties without restriction. He's gotten no medical treatment since March of 2008. He's not taking any pain medication. So the question is, if he has pain, how significant is the pain with no medication? And the purpose of the act. Two things I want to tell you. December the 10th, 2009, Elvie Bernstein says that he reviews a disprogram study that shows, quote, positive concordant findings associated with annual tears at C5, 6, and C6, 7. And just when you do a disprogram, Your Honor, and I'm sure you've heard how the procedure works, you get a needle stuck in your back, the person complains. When we asked Dr. Bernstein in his deposition about annular tears, he admitted that when he looked at the diagnostic studies and tests, there were no annular tears. He said, otherwise, I would have made that finding. So what we have here, and I agree there's some bad IME reports, but the purpose of the And there's no testimony here by Bernstein or any physician that the recommended surgery is going to cure or relieve anything. What we know here is we've got a totally functional person. That's why I say this is so different than any case I've ever argued when it comes to manifest weight. Usually you've got one doctor having all kinds of positive findings, record- or restrictions in work, ongoing care. There's none of this here. Since December of 2008, he's worked a very physically demanding job, sometimes up to 14 hours. He's gotten no medical treatment. We tried this case in July of 2011. Two and a half years with no medical care and treatment. Two and a half years with no medication. Okay? He's still working unrestricted. He's not being treated. The argument here is all of these facts fly in the face of doing an aggressive surgical procedure on someone who is functioning today. Someone who's functioning, being able to perform his full duty without any restrictions. What we're doing here is taking someone who's totally functional, I think I'm arguing on his side, and putting him through a surgical procedure that may make him non-functional. Kennedy. But can I ask you a question? Because a guy works when he's hurting, does that mean he's not entitled to benefits under the Act? No. But it's got to be medical care and treatment to cure and relieve. And there's nothing here to cure and relieve. There's nothing from Bernstein that says if I do this procedure, if you look at our responsibilities set out in counsel's brief, there's nothing in this procedure where he says I'm going to cure and relieve the guy. Wait a minute. Mr. McCloskey, you're well aware, and we understand, if someone has spinal surgery, you only got a third of a chance that it's going to help you. A third of these people wind up worse off than when they started. That's right. A third of them wind up in exactly the same position, and only a third of them get cured. So should we turn around and say, well, no spine surgery, because you only got a 33% chance? But there's nothing to cure. Doctor, everyone says in this case there's no objective signs of anything going on in this person. How do you take someone who's totally functional and say let's do this aggressive procedure, and maybe wind up putting him in a spot where he can't come back to work ever? And then we're taking him from his full salary to 66 and two-thirds, and then you knock off 20% of that, and we're at 52%. What are we trying to cure by an aggressive surgery when no one can find anything objectively wrong? And how different is this case in terms of the facts that any of you have seen before deciding? Have you ever seen a case where we're talking about this type of procedure and no one can find anything objectively wrong with the person? Or having this person be able to work for six and a half years? Having this person be able to work without any medication? What are we trying to accomplish here? Counsel, thank you for your time. Thank you very much for your time. I appreciate it. This matter will be taken under advisement, and this position shall issue. Thank you. The court will stand at recess until 9 a.m. tomorrow morning. Subject to call. No, that's tomorrow. We don't say tomorrow.